Good morning, thank you, Your Honor. May it please the Court, my name is Wes Davis. I represent the appellant, Riversource Insurance Company. My argument today will focus on issues one and two. However, if Your Honors have questions over the remaining issues, I'm happy to answer any questions you have. I just want to use the time on the issues that I think are the most important. The first issue involves jury questions that the district court judge refused to issue. This is a diversity case involving a private disability insurance policy. The primary issue with these requested jury questions that were not included in the jury's verdict form was a surgery which resolved the insured's seizures. The disability was based on, or the insured had numerous GTC seizures, which are, from my understanding, violent seizures which resulted in loss of consciousness. And the insured had a car accident, which sort of triggered the insurance claim and triggered, I believe, more seizures. My client, Riversource, denied the insurance claim, and for a number of reasons, in that the breach of insurance contract claim went to trial. During discovery and trial, Riversource discovered that the insured had a surgery in 2019 that completely resolved all of the seizures. Afterwards, she contended at trial that she remained totally disabled based on cognitive issues and memory issues that remained from her epileptic condition. At trial, Riversource contended that this was a result of her disability, the lack of seizures. Disability is not, correct me if I'm wrong, not purely the lack of seizures, but also the cognitive impairment, inability to do this kind of work as a result of the epilepsy generally, and so it's not just, okay, numerous seizures, therefore not disabled anymore. Isn't the evidence a little bit broader than that? Absolutely, the evidence is broader than that, Your Honor, and the issue is not whether there's evidence to show that those issues caused a disability. It's whether there's a question of fact as to whether that disability remained a total disability under the policy after the seizure. Well, we're talking about jury questions here, right, and the court has discretion about whether to submit jury questions or not. The court did ask whether the jury finds from preponderance of the evidence that Riversource failed to comply with the policy. Wouldn't that subsume the question you're asking about, about the ending of total disability? It would not, Your Honor, because Riversource could fail to comply with the policy from the time that it denied coverage in 2017 through the time of surgery in 2019, and not fail to comply with the policy after the surgery which resulted in seizures, and that's a question of fact that the judge refused to issue. How much of that is dependent upon the, um, Riversource tried to amend the complaint after the deposition to, I mean, not the complaint, your responsive pleading after the deposition to assert some defenses, one of which was you're no longer disabled. I mean, I'm paraphrasing grossly, but along those lines, correct? Um, so how much of the jury question issue draws back to the denial of leave to amend the pleading? Partially. So question number two, which is the question that asked is the disability, did the disability end? That, in my opinion, legally does not depend on affirmative defense because the insurer bears the burden to prove coverage. So the insurance policy says you receive your total disability benefit while you're totally disabled, and you do not receive a total disability benefit if your disability ends. So that's the insurance burden to prove. There's not an affirmative defense necessary for Riversource to contend that the disability ended. Even if it were, Riversource did plead in its original pleading that Ms. Singh was not entitled to insurance coverage, which I believe is broad enough to address that issue. As to the coverage limitation for... I guess, so then it sounds to me like we can, we can almost say that to the extent there was an error in the denial of leave to amend, it would have been harmless. In other words, it didn't prejudice Riversource because you were able to present the theory anyway. As to question two, I agree with you. As to question three, I believe it's a coverage limitation that goes to mental and nervousness issues, and that would require an affirmative defense, and that was not in the original pleading, and it was in the amended pleading that was refused. Do I understand it correctly, there's sort of a nuance here with question three, that well, there was this surgery in 2019, the seizures stopped thereafter, so the character of the disability changed to the extent it persisted? In other words, it went from being a physical disability to mental nervous? Yes. Is that the argument that you're making? That is the argument, yes, Your Honors. And by the denial of the motion for leave to amend, were there also evidentiary matters the district court said, no, no, no, that's not coming in, you didn't assert it timely, or what? Yes, so the district court refused to allow testimony regarding that coverage limitation, refused the jury question, and refused, you know, any instruction or any, you know, reference to it during the trial, the mental or nervousness disorder limitation, and I would just add on that, that limitation, it comes into play when there is not a physical disability. When there is a physical disability, so you'll see cases where, you know, somebody's injured and they also have PTSD or anxiety, and anxiety was part of the issue here, you can't rely on that exclusion when they've got a physical injury that goes along with it. And the epileptic seizures were a physical disability. Correct. And now that there are no epileptic seizures, the only remaining issue was a mental issue that was alleged, and I would add that a large portion of the evidence relied on at trial and on this appeal concerns analysis from a doctor named Dr. Holcomb who works for a place called Austin Family Mental Health. He is a psychiatrist, so obviously that's mental health issues. He's not a neurologist. He does not address seizures or, you know, brain conditions. He only focuses on mental health, and that is a doctor that primarily has been relied on for the allegation that the disability continues after the seizure is discontinued. So back to this motion for leave to amend, there were other things you wanted to assert too. I mean, there's sort of the application misrepresentations and medical record questions. The district court, if I recall, said it's untimely, you waited too long to do this. Was that the basis of the district court's ruling across the board, or did the district court separate these separate things that River Source wanted to plead? Yeah, so I would, as far as the answer, which is what we were talking about a moment ago with the affirmative defenses, the district court did not address the answer or the merits of the answer or the basis for the answer, other than to say it was untimely. It kind of got swept in collectively with the counterclaim, which... When did River Source, and the counterclaim, I guess, was based on the misrepresentations alleged and the medical record discrepancies alleged by River Source, but when did River Source first have grounds to know about this issue we're talking about, the distinction between the physical seizures and mental nervous disability, call it, that was ongoing post-surgery? So the first time that River Source found out about the surgery was during Ms. Singh's deposition, which was in February of 2021. The pleadings deadline was in November of 2020, so it was long after the pleadings deadline. One of the issues that the district court addressed was that, you know, the day after the deposition, River Source did not file an amended answer, or an amended pleading and an answer, and... When did River Source do it? It was... I believe it was April 21 of 21. The discovery deadline was April 9th, I believe, and the reason for that was River Source wanted to wait until the deposition became final so that there wouldn't be any changing of testimony or, you know, anything to try to dispute the facts that River Source felt they had found in that deposition that were important. And given that, you know, the pleading deadline had passed, the trial was not until November of 2021, so there were approximately six months left. Was there any discovery with respect to whether the medical records were actually changed at her request? When she found out about her admissions? Yes, Your Honor. In the deposition, she stated that they were changed at her request, and I believe it was just an explanation that she thought it was a mistake in the doctor's notes that the doctor had interpreted it incorrectly. So was there an admission by the medical records people or the doctor that they did change the records? Yes. Okay. Yes, they were changed at her request. And addressing the amendment factors further, it's hard to, other than just missing a deadline or filing after the deadline, which admittedly that is what happened, all of the factors are in favor of allowing an amendment. There is good cause. It was information that River Source found out during the trial, or I'm sorry, during the discovery and pretrial, after the deadline. There could not have been a way for River Source to file this before the deadline. They didn't have the information. It was not a lack of diligence by River Source. It was not information River Source could have obtained anywhere else other than from the plaintiff's records and the plaintiff's testimony. And there was plenty of time before trial in order to address any discovery issues, and indeed, those discovery issues were addressed because the district court did not rule on the motion to amend for a few months, for many months. So in the meantime, the parties agreed to conduct the discovery necessary to address those issues, and they did conduct that discovery. Would River Source have gotten the medical records and documents regarding the November 19 surgery? I can't remember when the surgery was. It was 2019. I believe the actual date of the surgery was September 30, 2019. All right. Well, would River Source have had medical records up to the present time when you took the deposition of the plaintiff in 2020? I mean, in other words, would you have already had the records of the surgery and all that sort of thing before the deposition? Not only did River Source not have the records before the deposition, those records were never produced by the plaintiff. The only records introduced at trial predate September 30, 2019. There are no records after that date, no medical records that were introduced at trial. Would River Source have discovery requests that would have covered? Yes, absolutely, Your Honor. Was there a motion to compel or anything like that? Did River Source press it? Not that I'm aware of. And I agree that that issue could have been addressed. However, the discovery period, as I said, ended April 9, 2021. I mean, I stopped myself from asking the question I'm about to ask it, but why? Why wasn't there a motion to compel? Why wouldn't you press it if that was kind of relevant as to determining the scope and duration and type of disability that was at issue? Yeah, the only answer I can give you in retrospect is River Source, we were busy addressing the counterclaim issues and trying to get that squared away. It's an important and hard counterclaim to make, addressing fraudulent interpretation of insurance. Well, but I mean, step back a little bit, wait a minute. If you're getting ready for the plaintiff's deposition, surely it would also be an important issue because, I mean, River Source's position, as I understand it, is, well, this was timely because she didn't authenticate the documents or talk about the medical records or talk about the surgery until the deposition, okay, but would you not have also gotten the medical records to examiner during the deposition beforehand? I mean, we're talking about 2020, prediscovery deadline, and if the issue is the timeliness of the motion for leave to amend, do you see the crux of the question? Absolutely. So the question is, why not prior to February 2021 deposition? Yes. I would say the reason for that is generally, in these civil cases, discovery of documents stops when the litigation begins, if that makes sense. So... That wasn't the way I practice law. Yeah, it doesn't have to stop, but parties will, they get their documents together. When were her physicians deposed? They were not deposed. The physician documents were agreed to be admitted. All right. So the plaintiff was deposed. Who else was deposed, I guess, from her side of the case to substantiate the disability or her medical condition, if the doctors were not? Her ex-husband. Okay. I mean, it is what it is. They didn't press the medical records. So I guess they deposed her without her medical records. They deposed her with the medical records that they had up to that point. At the time of the deposition, I would tell you there was no reason to expect that they needed those additional records. There was no... River Source did not know that the seizures had stopped. So I think up to the point of the deposition, River Source believed those records were fairly complete. However, after the deposition, recognizing the seizures had discontinued... Did the records include the surgical records? So it includes the immediate post-operative report. So you knew she had the surgery? Knew she had surgery, but did not know that none of the seizures had continued. When did River Source know she had surgery? First known? It would be when the documents were produced, which was probably... I don't have the date right now, but before the deposition, before February 21. All right. So you had the records. You knew the surgery had happened. Right. What you're saying is... I'm just trying to be very clear about this. What you're saying was the revelation, so to speak, was she stopped having seizures after the surgery. She was seizure-free at that point. Correct. Okay. Anything else? Thank you, Counselor. Thank you. A lot of time for rebuttal. Mr. Roach. Thank you, Your Honor. No, River Source never deposed any of the plaintiff's doctors. River Source did have the medical records because they subpoenaed them. You'd have to state your name for the record. I'm sorry? You'd have to state your name for the record. I'm sorry, Your Honor. Lonnie Roach for the APLE, Jodi Singh. Got a little excited there. River Source had the medical records because they subpoenaed the medical records. They didn't subpoena all the medical records. They could have subpoenaed all of the medical records. They didn't think it was important. And the reason why River Source didn't think it was important to subpoena her post-surgery records is because River Source's defense for more than four years in this case was that Jodi Singh's seizures were not disabling. They just felt she wasn't disabled under the terms of the policy. River Source claims it had an epiphany after it learned that the surgery, which was designed to reduce or eliminate seizures, did in fact reduce and eliminated, for a time, seizures, and that that changes the nature of this case. But River Source never considered the seizures disabling. Jodi Singh had seizures for 10 years before she filed a claim on this policy. How would you describe the disability here? Disability? I'm sorry? How would you describe the disability? The disability? At issue. In other words, was it the seizures? Was it mental or nervous? Was it anxiety? Was it this inability to have executive function? It is not mental or nervous. Epilepsy is a progressive condition, and it gets worse over time. The reason it gets worse over time is because it damages areas of the brain. In this case, we know it was Ms. Singh's amygdala and hippocampus that the seizure focus was being damaged by these progressive seizures. Jodi Singh was diagnosed with epilepsy in 2005, but the seizures she was having had not damaged her brain to the extent that she was prevented from working. I guess I'm asking because I take River Source's briefing and position on appeal to be that the disability is the seizures. Physical disability, she's having seizures, that keeps her from functioning. But then, in her deposition, they find out about the surgery, although they seem to have had the records about the surgery occurring, they find out that the surgery was successful in preventing the seizures, so then no disability. Or the disability changed in character to mental nervous. Those are different terms of the policy, right? It did not change in character. That's what I'm getting at. How would plaintiff define the disability at issue? She would define her disabling condition as her almost total loss of executive functionings. In other words, the ability to make decisions. She is still intelligent, but she's lost her short-term memory and she has almost no ability to make a decision on something. Her executive functionings were damaged. Those are controlled by the hippocampus. When the seizures stopped, post-surgery, does that change the nature of the disability to mental or nervous only? In other words, non-physical? It did not. A mental nervous condition is a condition that is generally defined by the DSM-5, the Diagnostic and Statistical Manual, that is the type of condition that you would treat with psychotherapy or you would treat with anti-anxiety medication. Mental health? Mental health, exactly. But is that defined in the policy that way? Yes, it is. So the policy references the DSM or? No, the policy has a definition for mental nervous condition. It's actually in the briefing somewhere. I remember reading it last night. But the policy does define mental nervous conditions. Epilepsy is not among them. Is it true that, as River Source says, the first time River Source would have known that the surgery was successful in stopping the seizures, was it true that they learned that first in the deposition? That's the first time they were told that directly by the plaintiff. Were they told indirectly? They could have known by looking at the medical records and seeing that there were no reported additional seizures. The problem is when some . . . But I mean the first time, basically they said, well, have you had seizures since the surgery? And the plaintiff says no. I mean, is that basically what happened in the . . . That's exactly what happened. All right. So I mean, I guess back to my questions to counsel opposite, they tried to amend the pleading, I'm sorry, the answer, to assert a defense that, well, the disability is now only mental or nervous, which implicates the duration of benefits and whatnot. The district court says, no, that's not timely. And there were other things they wanted to do as well, assert a counterclaim and assert this other defense. I guess my question to you is, well, when were they supposed to assert this defense if they didn't know about it until after the deposition? And does it implicate, longer question, this jury question number three and the proof that came out at trial and et cetera? They should have first asked the court, in all probability, if they wanted to raise a policy limitation. A policy limitation is clearly an affirmative defense. And if they want to raise an affirmative defense after the fact, after they've already breached the contract, they should have approached the court and tried to amend to raise that policy limitation when they first, I guess, realized that the policy limitation could be in effect. But they said that they first realized it during the deposition, so two months later they've moved to amend their responsive pleading, and the court says that's untimely. Is the district court, did it abuse its discretion in doing so? Let's see, it's not, Your Honor, because what they wanted, first of all, what they asked the court to do is submit a jury question stating that her entire condition was a mental nervous condition, which it clearly wasn't. If they wanted to amend to claim a policy limitation, then they would have at least need to say at which point her condition changed from one thing to the other. Let's say they said on the day of her surgery, on the day of her surgery while she's still in the hospital before she's released, she's no longer physically disabled. Then at that point, they would still be obligated to pay for another two years of benefits under the terms of the policy, which takes us to the time of trial. Well, it takes us to the time of trial, so granted, no harm, no foul up maybe until that point, but then what about after that point? Because that two-year period expires. But is it true or not true that River Source, the district court prevented River Source from adducing evidence, introducing evidence to this effect, or proceeding with that theory at trial? They were not allowed to argue the policy limitation at trial. They were not allowed to argue that Jodi Singh's disability was caused by a mental nervous condition at trial because it wasn't properly before the court. It had not been pled, and even if it had been pled, it wouldn't have taken an effect at that point by the time we reached the trial. We know that the district court disallowed the questions two and three that they offered in the jury instructions and asked the question that was asked, but I guess my worry is if you pull the sweater at the point of the motion for leave to amend to assert this defense, doesn't it unravel everything that happened after that because River Source was prevented from pleading something that they could then prove and then ask the jury about? Is that an overly simplistic reading of what the problem may be here? I don't believe so. So you're saying I'm right in assessing it that way, or tell me how we don't have to say, well, geez, you abused your discretion in not allowing them to assert this theory. Because first of all, I don't believe it would be correct to say the judge abused its discretion and failing to submit jury questions. Not the jury question. Let's go back to the motion for leave to amend. In other words, that's the thing that starts the dominoes falling if the way I've encapsulated the case is wrong. Then in that case, we have to look at that motion for leave to amend. All right. We go back in time to April 2021, and we look at that motion for leave to amend. What River Source was actually doing in that motion for leave to amend, this one issue you mentioned earlier that they sought for leave to amend to say that she had recovered. No, they didn't seek to amend at that point to allege that she recovered. The only ancillary defense they added to their amended complaint that they wanted to file was that this mental nervous limitation in the policy was implicated. The overwhelming bulk of their motion for leave to amend was to change the entire nature of the case. To turn this case from a simple insurance case where Jodi Singh alleged that she was disabled under the terms of the policy, River Source alleged that she was not disabled under the terms of the policy. They wanted to convert this case into a fraud case, even though they had no evidence of fraud. That's their counterclaim. Yes, that's their counterclaim. Put that aside. They wanted to add counterclaims for attorney's fees. Okay. Put that aside. The district court said it's untimely. They had documents that kind of substantiate this. Let's just stipulate all of that. Let's go to the defenses we're talking about. And the remaining defense, the only defense that's at issue in this appeal that they wanted to add at that point is that they wanted to allege that after her surgery, her condition became a mental nervous condition and it was no longer a physical condition, which is factually incorrect by the way. That issue was so wrapped up with the pleading that they asked the court to amend that there was no way the court could allow them at that point to change the very nature of the case after. It's not just that the deadline to amend their pleadings had passed. The discovery deadline had passed. The dispositive motion deadline had passed. We were on the downward slope to trial when they came up with this theory that they wanted to allege. The theories that River Source brings to this court are theories that it didn't address for four and a half years of claim administration or denying the claim and then litigation. And they came up shortly before trial. Here's the question in my mind. If they had no basis to assert this theory before the deposition in February of 21 and then they tried to assert the theory in April of 21, that seems to be one question. But if you're arguing that they had the basis to assert the theory all along for four and a half years, then I think it becomes a different inquiry as to whether the district court abused its discretion. So I guess the question is, when did they first have the basis to assert this theory? Well, I don't, under the facts of this case, they never had the basis to assert this theory because they denied, when they denied the claim under Texas law, at that point we had to draw a line. We go and decide the question. We decide the breach of contract that occurred when they denied this case. If they want to assert that theory that, well, now we think that she only got two more years and she's no longer disabled because it's a, or she's no longer entitled to benefits because it's a malnervous claim, they can do so. In a disability case, if this court were to affirm the judgment, this case simply goes back for a normal administration for the next 16 years. You're saying it's a new case. It is. It's a different case they can bring at the end of the two years. It absolutely is. And that is typically what happens in disability cases. It's not unusual for a particular claim to go through several denials where an insurance company might deny a claim saying, we don't think you're disabled. And after that one gets overturned, they say, well, okay, well, now we don't think you're There can be multiple denials in a disability case, and there typically are. It's just that that denial is not in this case. So I can understand what we're talking about. When Judge Wilson and you were talking about the theory, is the theory that we're talking about that this woman had epilepsy, which I don't see anybody denying, that she had seizures, which I don't see anybody denying, but that when she had the surgery, all of a sudden her disability changed into a mental or emotional disability? Is that the theory we're talking about? That is their argument. Okay. Just wanted to understand that. Yes. Yes. That is what that is. Nobody denies she had epilepsy. Nobody denies she had seizures. And she had a seizure in a car that resulted in a car crash. It did. It did. Okay. And then she had surgery, which, okay, came up in the deposition. And then the theory is, is that now she's disabled because of a mental or emotional condition, not the epilepsy and the seizures, because now there's testimony that she doesn't have seizures. That is correct. Their theory assumes that the only physical disabling condition was the convulsive seizures that she suffered from her epilepsy, as opposed to the brain damage that was caused by the surgery to treat. What did the surgery do? The surgery ablated or destroyed her amygdala and her hippocampus and the right temporal lobe of her brain. So when she, when she, no doubt that there's still a physical condition there. I'm sorry? There's no doubt that there's still a physical condition there. That sounds like pretty serious surgery. Well, that's exactly it. We always believe that was self-evident, that when the treatment, the recommended treatment for her condition when she came out of the Cleveland Clinic in February 2016 was the surgical removal of the right temporal lobe of her brain. And she was a bit distraught about that. Among other things, it could cause her to lose all of her memory and to lose a lobe of her brain. This is a person who attended Princeton, had an engineering degree from Princeton, spoke five languages, and she didn't want to have the right temporal lobe of her brain removed. And so she sought a less, a marginally less invasive surgery. So the theory is that after she had the right temporal lobe of her brain removed, that all of a sudden her disability turned into an emotional disability. That is their, that is their claim. Did she have the mental nervous condition disability before the surgery, along with the epilepsy? She did not. She has never had any disabling mental or nervous condition. She treats with her psychiatrist, Dr. Holcomb in Austin. He does, he does counsel her for PTSD after the automobile accident. But he actually manages her anti-epileptic medication, continues to do so. Psychiatrists are often the doctors that coordinate, because her main treating physician is at Johns Hopkins. And it's not convenient for her to go to Johns Hopkins on a monthly basis to have her medication managed. And so Dr. Holcomb, a psychiatrist, manages her epileptic medication. But in the record, Dr. Holcomb put a statement in that said she has a physical condition. He didn't say that she has, that she's disabled due to a mental nervous condition. But was she able to work before the surgery? Yes. She worked, she, well, not before the surgery, I'm sorry. She was first diagnosed with epilepsy in 2005. She continued to work until 2015, when she was involved in the accident. And she has never been able to return to work after December of 2015. And so... Was she physically injured in the accident? Yes, she was. She was. Yes. No, the other person was killed. There was a person killed. She was injured and she suffered a closed head injury that was documented in the records of the Cleveland Clinic. And we don't know... What we know is that after that accident, her epilepsy, which she had been living with for 10 years and working for 10 years, took a significant turn for the worse. We don't know whether the accident caused it to take a turn for the worse or possibly the epilepsy, the seizure caused it, both the accident and caused it to take a turn for the worse. But what we do know is that after that accident in December of 2015, she lost all of her executive functioning ability. She lost the ability to manage finances, which was problematic since her job for the company, one of the companies that she was a partnership in, was to handle their finances. She couldn't even handle her own personal finances. She lost the ability to make a schedule, to make any decisions, basically. But we know, and had known for quite some time, that the areas of her brain that were affected by her epilepsy, her amygdala and hippocampus, were those areas of the brain responsible for these executive functioning and making decisions. So we know that those areas had some damage before the December 2015 accident. We just know that she got significantly worse after that accident. And the following month after that December accident was when she was admitted to the Epilepsy Monitoring Unit of the Cleveland Clinic, where she had two grand mal seizures while being monitored at the Cleveland Clinic. And it was the doctors there who determined that the only way to address these seizures and to stop these seizures, or to try to stop these seizures, is to remove those portions of your brain that the seizures are arising out of. And that was ultimately what happened, albeit three years later, when she had the surgical ablation, once again at Johns Hopkins. At Johns Hopkins, they did the ablation to surgically destroy the hippocampus and the amygdala in the right temporal lobe of her brain. And so this has never been a mental nervous claim. Now, when this case goes back to River Source after this case is over, if they want to allege that, if they want to deny her claim and say, we deny you because we think that you're disabled due to a mental nervous condition and we only owe you two years of benefits for that, they can do so. They're not prevented from doing that. If they want to say, well, we think you're cured, we think you're better, go on. We don't need to pay any benefits. They can do that. They're not prevented from doing that by anything this court can do. They're just preventing it, doing it in this case. Thank you, counsel. Mr. Davis, rebuttal. Thank you, Your Honor. I wanted to just focus on, I think, the primary issue in what our appeal is. And it's whether River Source could present these theories of defense that we've all been discussing here to the court during trial and to the jury in the jury charge. And that's the issue here is, I would not dispute that Ms. Singh has an argument that the disability continued after the seizures stopped. I don't dispute that. But River Source also has an argument that the disability did stop. And River Source was prevented from presenting that in the jury's charge. Effectively, the judge ruled as a matter of law that the disability continued after the River Source has requested jury instruction. And I think the counsel's description of the seizures is important here. As he said, Ms. Singh began having seizures in 2005. She continued to work all during that time and did not make a disability claim during that time. In 2015, she had the car accident and her seizures worsened and she made a disability claim. In 2019, her seizures stopped. So the question under the policy is, when could she work? She could work from 2005 to 2015 while having some form of seizures. She claims she cannot work after 2019 when there are no seizures. That's an issue of fact that we should have been able to present in the jury charge, whether or not she could go back to work. And there is no information in the record from any doctor that says after the surgery that Ms. Singh cannot go back to work despite the cessation of her seizures. The documents from Dr. Holcomb, again, that are identified at length in the record, they all predate the surgery. So Dr. Holcomb said, and again, he's a psychiatrist, she cannot go back to work with this condition at any time. She cannot go back to her old occupation. However, he never addresses at all what she could do after her surgery that stopped her seizures. And that's despite the fact that as of the date of trial, she was continuing to see Dr. Holcomb. And again, this is not River Source's burden of proof here. This is an insurance coverage lawsuit in which the insured bears the burden of proof to show coverage. River Source doesn't bear the burden of proof to show that coverage does not exist. The insurer bears the initial burden to show that there is insurance coverage. And that burden was not satisfied as to the disability after the 2019 surgery. That's our argument. And there can be arguments against that. There are issues of fact either way. But that is why it was error not to include that issue in the charge. And that's why it was error not to allow River Source to amend its answer. One thing I wanted to touch on, on the mental nervous issues and whether it should have been... The jury never heard that after the surgery she didn't have any seizures. They heard that. The jury heard that. The jury heard that. They were not allowed to answer the question of whether the lack of seizures resolved her disability. And the jury never heard the mental nervous disorder limitation at all. I'm assuming the jury was instructed about the terms of the policy and what the definition of total disability is? Yes. Okay. And the jury was asked, did River Source violate the policy? Yes, that was the one question. Did River Source breach the contract? Yes or no. Answer was yes. So, River Source could have breached the contract from the date of denial of the claim in 2017 through the date of either when the surgery happened. Or there are numerous doctors, Ms. Singh's doctors, who the evidence was submitted by the plaintiff in this case that said after her seizures stop, her ability to return, we can reevaluate her ability to return to work. One doctor said six months after. And these are the neurologists, not the psychiatrists. Was the jury asked to quantify damages caused by the... They were not. And that could have cured this issue, Your Honor. The damages were quantified by monthly benefits, which were stipulated. So it's a certain amount a month that Ms. Singh would be paid under the policy. That amount was stipulated and the judge entered an order for every month from the month of denial through the date of trial. And I'm sorry, that's what the final judgment ordered. And so that is what our complaint on question number two is. There was not a jury answer to the factual issue of whether the disability could have stopped after the cessation of the seizures to support that final judgment. Okay. Thank you, counsel. Thank you, Your Honor. A well-argued case. We'll take the matter under advisement.